Ortley **CHARLES, Jr.**

v.

**NATIONAL TEA COMPANY et al.**

**Civ. A. No. 761156.**

United States District Court,
W. D. Louisiana,
Lafayette-Opelousas Division.

March 20, 1980.

Louis B. Viviano, Anthony G. Terracina, Opelousas, La., for plaintiff.

Jimmy L. Dauzat, Opelousas, La., for defendants.

## OPINION

SHAW, District Judge.

This matter involves a discrimination and civil rights action under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, et seq., and under the Civil Rights Act of 1866, 42 U.S.C.A. § 1981.

*General Background Facts*

In 1963, and for some time prior thereto, the plaintiff, Ortley Charles, Jr., was employed as a service station attendant at Hebert's Gulf Pride Service Station, directly across the street from the supermarket of the defendant, National Tea Company (National). In January, of 1963, the National store manager, Roland Alleman, solicited the plaintiff to accept the job of porter at National, which the plaintiff accepted on January 7, 1963.

The plaintiff performed his duties satisfactorily for the first year and one-half and then the quality of his work fell off but not to any great extent. The plaintiff had an eighth grade education and while employed at National, he attended night school for two years and received his high school diploma in 1965. On September 20, 1966, plaintiff was hospitalized at the Central Hospital in Pineville, Louisiana, for a nervous breakdown and was released three months later. He returned to work as a porter shortly after his release but remained on medication until sometime in 1973. The record does not indicate that the plaintiff's functional disorders were in any way related to the conduct of the defendants.

During plaintiff's absence, his job was held open for him and he was paid his full wages. Upon his return, the manager, Alleman, kept him on although it is clear that plaintiff's performance as a porter deteriorated. The District Manager of National, Chester Lantier, warned Alleman that he could lose his job due to the sloppy condition of the store. Yet, Alleman did not discharge the plaintiff, and on many occasions, performed some of the plaintiff's duties himself or had these duties performed by others. Sometime between 1969, and 1973, plaintiff's condition and his work improved. In the early part of 1974, plaintiff demanded a promotion to stock clerk, and was promoted to that position on February 4, 1974. Plaintiff immediately caught on and performed exceedingly well as a stock clerk. During his eleven years as a porter, plaintiff observed everything going on in the store, and moved into the stock clerk's position with ease.

All non-management personnel at National are members of the retail clerk's union. Various contracts have been in existence since 1963. The plaintiff has always been a member of this union, and was elected First Vice President and Shop Steward in 1974, and is also on the Audit Committee. In his capacity as Shop Steward, plaintiff was in charge of grievances with management at the Opelousas store. Since that time, there has been a war between plaintiff and management almost without interruption. If National put it to the plaintiff in the 60's, the plaintiff put it to National in the 70's.

On July 14, 1975, Alleman fired the plaintiff after they were involved in a heated argument in the meat department over the plaintiff's use of the telephone. As a result of this incident, Alleman was transferred and plaintiff was reinstated with back pay at his former position at National, on September 2, 1975.

Later, the plaintiff demanded and received the position of back door clerk which involved extra pay and was the highest non-management position in the store. It is apparent from the testimony that the plaintiff could obtain the position of co-manager but is reluctant to seek or accept it because he fears he would no longer have the protection of union membership, and that National would then fire him.

In the meantime, plaintiff comes to work late whenever he so desires, switches hours with individuals without informing management, uses his position with the union to harass management and other employees, and "hogs" the overtime employment.

A formal written charge of discrimination was filed with the Equal Employment Opportunity Commission (EEOC) by plaintiff against National, its manager, Alleman, the District Manager, Chester Lantier, and others, dated August 13, 1975.

Plaintiff, through his attorney, requested from the EEOC a notice of right to sue by letter, dated July 13, 1976, and said notice

was executed by the New Orleans District Office of the EEOC dated August 2, 1976, and suit was filed by the plaintiff on October 28, 1976, charging a violation of Title VII of the Civil Rights Act of 1964 or Civil Rights Act of 1971, and employment discrimination under 42 U.S.C. § 1981.

After the plaintiff was reinstated, he claims that he had problems around November of 1975, with the new store manager, Alex DeNais, who had replaced Alleman. At that time, Sunday work was allocated on a seniority basis. This was changed to a rotation basis after the plaintiff filed a complaint. The plaintiff also complained to DeNais around the First of November, 1975, that he was called on to do more than his share of cleanup work. Thereafter, DeNais was careful not to assign plaintiff more than his share of cleanup work.

Plaintiff, in his charge of discrimination with the EEOC, dated August 13, 1975, claims that the discrimination began about two years after he came to work when he asked Alleman to promote him to stock clerk in 1965, and Alleman refused. Plaintiff contends that he continued as a porter for another eight years, at which time, he got the backing of the union, demanded a promotion to stock clerk and was appointed on February 4, 1974. Plaintiff also claims that after he was elected Union Shop Steward in the early part of 1975, Alleman started putting pressure on him, threatening to fire him and started "writing him up" for any little thing that happened. The plaintiff contended that all of this ended up with Alleman firing him because he was black and resented plaintiff demanding a promotion and being Shop Steward. Plaintiff claims injunctive relief to enjoin National or its agents from maintaining or practicing any policies which discriminate against plaintiff, damages for loss of salary, retirement benefits, unemployment benefits, fringe benefits, mental anguish, emotional distress, physical pain and attorney's fees.

### Findings of Fact

1. The plaintiff, Ortley Charles, Jr., is a resident of Opelousas, St. Landry Parish, Louisiana.

2. National Tea Company is a foreign corporation, doing business interstate, and is licensed to do and doing business in the State of Louisiana; Roland Alleman is a resident of Lafayette, Lafayette Parish, Louisiana; Donald S. Fontenot is a resident of Eunice, St. Landry Parish, Louisiana, and Chester Lantier is a resident of Lafayette, Lafayette Parish, Louisiana.

3. This Court has subject matter jurisdiction under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq., and under the Civil Rights of Act of 1866, 42 U.S.C.A. § 1981.

4. The plaintiff was competent after 1965, when he received his high school diploma to handle the position of stock clerk at National.

5. National had no policy or guidelines whatsoever for promotions within the company from full-time porter, the lowest job in the store, to the next level of stock clerk.

6. The population of Opelousas, Louisiana, was approximately fifty (50%) per cent black during all times pertinent herein, and from 1963, to 1974, the period in which plaintiff worked as a porter, one full-time black woman was hired as a stock clerk from without the company, and no porters had been promoted to stock clerk from within the company. There was no intent by anyone to discriminate against the plaintiff by not promoting him, but no effort was made to do so until 1974, on the ill-founded belief that he could not handle the job of stock clerk. There is not a scintilla of evidence in the record that would indicate that Chester Lantier or Donald Fontenot, co-manager of the Opelousas store, engaged in any unlawful employment discrimination against plaintiff.

7. There are approximately fifteen to twenty employees at all times in the Opelousas store, and several openings for stock clerks were available from time to time.

8. There is no discrimination as a result of the Sunday work being allocated on a seniority basis or the fact that the plaintiff may have been required to do more of his

share of cleanup work for a short time until he complained of same in November, of 1975.

9. The plaintiff's discharge after a heated argument between the plaintiff and Alleman was a result of racial discrimination, notwithstanding the fact that it was the final incident in a power struggle between the two that had been brewing for sometime to determine who would run the National Supermarket Number 34. It was a contest for power between the manager, Alleman, and a stock clerk, strengthened by his position as Shop Steward, and First Vice President of his union. This battle was won hands down by the plaintiff, as he was reinstated by National to his former position with full back pay and Alleman was transferred to the Eunice, Louisiana store and shortly thereafter, left the company.

10. The store manager is the key. He conducts job interviews and does the hiring and firing. Since there is only one porter, the store manager, by necessity, must hire stock clerks from without the organization. If a situation would arise where a porter would be considered for promotion to stock clerk, the manager would make that decision. Although the District Manager, Chester Lantier, does have authority to promote, it is apparent that he would only be concerned with higher level promotions. The evidence does not indicate that Alleman ever consulted Lantier in regard to his hiring of numerous stock clerks from 1955, to 1975.

11. National had no policy for promotions of porters. It was the beginning and the end.

12. Managers are given no written instructions pertaining to the qualifications necessary for stock clerks. Any standards which were applied were vague and subjective. There were no safeguards to avert discriminatory practices.

13. It was the plaintiff's desire to remain in the employ of National. It is equally clear that he wanted to better himself within the company. He completed high school at night while working for the company. He did not embark on that endeavor to make himself a better porter. It was his obvious desire to all that he sought promotion. He literally learned all the functions of a stock clerk as he performed his duties as a porter. He was ready and qualified by 1966. However, at that time, his medical problems intervened.

14. Due to the plaintiff's medical problems, National actually carried him when he could not or would not perform his duties as a porter in a satisfactory manner. This gesture of kindness, however, cannot be used to offset discrimination.

15. The plaintiff received his promotion to stock clerk on February 4, 1974. However, it was approximately eleven months later before he was allowed to work the cash registers. The effect was to deny the plaintiff equal opportunity for overtime and holiday compensation. This practice was corrected approximately a year later, when the plaintiff qualified on the cash register after a fifteen minute tryout.

### Conclusions of Law

1. Title VII of the Civil Rights Act prohibits all forms of racial discrimination in all aspects of employment. The *degree* of discrimination practiced by an employer is unimportant under Title VII. Cases of this type are to approached primarily in terms of consequence rather than purpose and motive. *Rowe v. General Motors Corporation*, 457 F.2d 348 (1972, 5th Cir.).

2. The plaintiff filed his suit on October 28, 1976. The Court finds that no employment discrimination occurred after July 14, 1975, when the plaintiff was fired by Alleman. The timely filing of an employment discrimination charge with the EEOC pursuant to Title VII of the Civil Rights Act does not toll the running of the limitation period applicable to an action based on the same facts brought under 42 U.S.C. § 1981. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).

3. Under Section 1981, the Louisiana statute of limitations of one year is

applicable herein. In *Page v. U.S. Industries*, 556 F.2d 346, 352 (5th Cir. 1977), Judge Gee, as the organ of the Court, stated:

"In *Sims v. Orleans Railway & Light Co.*, 134 La. 897, 64 So. 823 (1914), the Louisiana Supreme Court defined 'offenses and quasi-offenses' as infringements of some right personal to the individual or the violation of some duty imposed by law. Louisiana federal district courts have used this definition to hold that actions under 42 U.S.C. § 1983 for state deprivations of civil rights constitute 'offenses and quasi-offenses' with the prescriptive period of one year found in La.Civ. Code art. 3536. *See Heyn v. Board of Supervisors*, 417 F.Supp. 603, 604–05 (E.D.La.1976); *Whitesell v. Rodriguez*, 351 F.Supp. 1042, 1044 (E.D.La. 1972). Similarly, we believe that the definition of 'offenses and quasi-offenses' includes actions under section 1981. As we noted recently, section 1981 cases arise independently of any contractual agreement between employee and employer, *see Ingram [v. Steven Robert Corp.]*, *supra* [547 F.2d 1260] at 1263 (5th Cir.); instead, they arise from the employer's violation of his duty not to violate the plaintiff's civil rights secured under section 1981. * * * "

4. Therefore, the Section 1981 complaint against all defendants is time-barred since the original complaint was not filed until more than one year after the 1981 cause of action accrued. *Johnson v. Railway Express Agency, Inc.*, supra.

5. The non-corporate defendants were not named in the charge filed with the EEOC on August 13, 1975. The plaintiff only designated National Supermarket Number 34 as the discriminating party. A party not named in an EEOC charge but subsequently joined as a defendant in an action filed in the Federal Court may not be held subject to liability for back pay. Therefore, the Title VII complaint against Roland Alleman is dismissed. *Bush v. Lone Star Steel Company*, 373 F.Supp. 526 (1974).

6. The filing of a formal charge before the EEOC is a jurisdictional prerequisite to the filing of a civil action under Title VII. That formal charge shall be filed within 180 days after the alleged unlawful employment practice occurred. *Hines v. Olinkraft, Inc.*, 413 F.Supp. 1360, 1363 (W.D.La.1976).

7. Under Title VII, past discriminatory acts may be treated as lawful since the plaintiff failed to file a charge of discrimination within the 180 days allowed by Title VII. A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed, and only those alleged acts of discriminatory conduct which occurred within the 180 days prior to the filing of a charge with the EEOC are admitted to proof.

8. Plaintiff has alleged a continuing violation. National's treatment of the plaintiff does indeed have a continuing impact on his pay and fringe benefits. The critical question is whether any present violation exists. The Court finds that it does not. What is involved here is a present effect of past discrimination. *United Airlines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

9. The only act during the 180 day period which would constitute discrimination was the firing of the plaintiff on July 14, 1975. The firing was not justified and National immediately recognized this, and reinstated plaintiff with back pay. The Court finds that the firing was a result of racial discrimination, which plaintiff has proved by a preponderance of the evidence. The facts are sufficient to sustain the inference that the firing of the plaintiff was motivated by impermissible considerations.

10. Since the Court has concluded that the plaintiff has proved a prima facie case by the preponderance of the evidence, it must consider the defendant's explanation or justification for the discriminatory action. The plaintiff was fired while he was "off the clock," and had not received a prior written warning as required by the union contract, nor was he engaged in any

impermissible activity. If the plaintiff became verbally abusive, so did Alleman. The Court finds that defendant did not reshift the burden of·proof to plaintiff.

11. However, the plaintiff was reinstated to his former position with full back pay and he is not entitled to any additional relief in the nature of compensatory or punitive damages. *Pearson v. Western Electric Company*, 542 F.2d 1150 (10th Cir. 1976).

12. The general background facts present evidence of discriminatory acts and practices that are no longer actionable because of plaintiff's failure to comply with the time requirements of Title VII and § 1981. These facts do constitute relevant background evidence which justifies the Court's determination to grant injunctive relief under 42 U.S.C. § 2000e–5(g) and it is ordered that defendant, National Tea Company, cease and desist from engaging in any reprisals or retaliation against plaintiff because of his assertion of his Title VII rights or because of his participation in the EEO process and that defendant shall not intentionally engage in systematic disparate treatment.

13. The work performed by Attorney Viviano at the administrative level and before the District Court consisted of two hundred three (203) hours. Ordinarily, Attorney Viviano would be compensated at the rate of SIXTY AND NO/100 ($60.00) DOLLARS per hour or a total of TWELVE THOUSAND ONE HUNDRED EIGHTY AND NO/100 ($12,180.00) DOLLARS. A plaintiff need not prevail on all or even most of his discrimination claims to be considered a prevailing plaintiff. However, the amount of the fee is strongly influenced by the extent to which the plaintiff prevails in his suit. *Adams v. Reed*, (5th Cir., 1978), 567 F.2d 1283. Mindful of the fact that the statute authorizing attorney's fees was passed to enable litigants to obtain competent counsel worthy of a contest with the calibre of counsel available to their opposition, the Court will award the plaintiff attorney's fees in the amount of SIX THOUSAND AND NO/100 ($6,000.00) DOLLARS.

The attorney for the plaintiff associated Attorney Terracina at the beginning of the trial. The time of two (2) lawyers in a courtroom when one would do, may obviously be discounted. *Johnson v. Georgia Highway Express, Inc.*, (5th Cir., 1974), 488 F.2d 714. The Court feels that since the defendants were represented by a single attorney and the attorney for the plaintiff was highly competent in the handling of this case, any additional fee for Attorney Terracina's services will be eliminated. Costs shall be allowed to the plaintiff as the prevailing party. 42 U.S.C. § 2000e–5(k).